Blake et al. *v.* Langdon et al.

---

## AMPLIUS BLAKE AND HIRAM C. McINTYRE *v.* JOHN B. LANGDON AND MOSES L. HART.

### IN CHANCERY.

The *general* rule, in equity as well as at law, is, that joint and separate debts cannot be set off against each other. But while at law the rule admits of no exceptions, and the parties to the record, only, will be regarded, a court of equity will, in a case of insolvency, regard the real parties,—those ultimately to be affected by the decree,—and allow a set-off of demands in reality mutual, although prosecuted in the name of other persons, *nominally* interested.

Courts of equity exercised a jurisdiction over the subject of set-off previous to the enactment of the statutes upon that subject; and their jurisdiction does not in any manner depend upon those statutes.

In this case, B. and H. were partners, B. furnishing the capital stock, and it was agreed between them, that B. should continue to furnish a certain amount of capital, and that, in lieu of interest and profits, H. should pay him a specified sum each year during the continuance of the partnership. Subsequently B. and M. formed a co-partnership in the same business, and became the successors of B. & H., the firm of B. & H. continuing only for the purpose of closing the former business; and M., who was the active partner, paid from time to time, at the request of H., with the property of

B. & M., debts due from the former firm, and charged the same to B. & H. upon the books of B. & M., and also received a note from H. signed with the name of the former firm, and also, for the purpose of paying a note due from a third person to B. & H., executed a negotiable promissory note to to H. alone.  This note was afterwards put in suit in the name of an indorsee, before the repeal of the statute allowing the maker of a negotiable note to have the benefit, as against the indorsee, of all legal and equitable defences to the note.  And it was held, upon a bill in chancery brought by B. and M. against H. and the indorsee of the last named note, that the account charged upon the books of B. & M. to B. & H. and the note held by B. & M. signed with the firm name of B. & H., must be set off against the note executed by B. & M. to H. and sued in the name of the indorsee, —it appearing that H. had become insolvent.

And it was also held, that if H., in such case, would seek to avoid the contract entered into between himself and B., he must file his cross bill, setting forth the grounds upon which he claimed relief.

Appeal from the court of chancery.  The orators alleged, in their bill, that a copartnership formerly existed, at Middlesex, between the orator Blake and the defendant Hart, Blake furnishing the capital stock  and Hart being the active partner ; that while they were thus doing business Blake executed a contract in writing, at the request of Hart, in these words ;—" Boston, November 25, 1830. 'This certifies, that I have agreed with Moses L. Hart to let him ' have all the profits of the business of Blake & Hart at Middlesex, 'and by his paying me $950,00 each year, the time to begin in ' September, 1829; and $40 of said first sum to be paid in good ' spruce shingles yearly, at $1,00 per thousand, at Middlesex ; and ' to let him have a capital of $3333,33, free of interest, to continue ' at that rate so long as we continue in business together ;—to ' pay $500,00 of said $950,00 annually, and interest on the re- ' mainder ;"—that the business continued under this contract until October 17, 1831, when Blake and Hart mutually executed a contract, which, so far as it related to the business at Middlesex, was in these words ;—" The said Hart agrees to give the said Blake ' $960,00 a year for his part of the profits of the store at Mid- ' dlesex, and said Blake is not to have interest on the goods left ' by him in the store to the amount of $3000, and what other ' property said Blake has, that Hart has the care of, that is draw- ' ing rent, or interest, said Blake is to have the same ;"—that

about the 27th of September, 1834, Blake and Hart settled their accounts as partners, in which Blake charged Hart with two years' and seven months' profits, at $950,00 a year, which was allowed by Hart, and there was found due from Hart to Blake a balance of $333,25, for which Hart gave his note, which still remained unpaid; that in the spring of 1832 the orator McIntyre purchased of Blake the goods in the store then occupied by Blake & Hart, and Blake & McIntyre formed a co-partnership, and carried on business in the store previously occupied by Blake & Hart,—McIntyre being the active partner, and Blake residing at Chelsea; that subsequently McIntyre, at the request of Hart, paid, from the property of Blake & McIntyre, various debts due from the firm of Blake & Hart, and which were contracted between September, 1829, and September, 1834, and charged the same to Blake & Hart upon the books of Blake & McIntyre,—McIntyre then having no knowledge of the agreements of November, 1830, and October, 1831, between Blake and Hart, and Blake having no knowledge, at the time, of the advances made by McIntyre to Hart on account of the debts of Blake & Hart; that on the 17th day of June, 1833, Hart, for the firm of Blake & Hart, gave a note, signed with the firm name, to Blake & McIntyre, for $68,75; that about the 8th of February, 1834, one Parker, being indebted to Blake & Hart, desired the orators to pay the same, and thereupon the orators executed their note, signed by McIntyre with the firm name, for the amount, and made the same, at Hart's request, payable to him, or his order, on demand with interest,—Hart then agreeing, that whatever account the orators had against him, or against the firm of Blake & Hart, should be allowed upon that note; that afterwards Hart endorsed this note to the defendant Langdon, who commenced a suit thereon, returnable to the Washington county court, November Term, 1839; that the orators filed a declaration in offset upon book account against Hart, and an auditor was appointed thereon, who reported the balance due to the orators, including the sums advanced by them on account of Blake & Hart, to be $184,10; that that sum was allowed by the county court as an offset to the note, and exceptions were taken by Langdon, and the case passed to the supreme court, where it was still pending; and that Hart had become wholly insolvent. And the orators prayed, that Langdon might be perpetually enjoined from prosecuting his

action upon the note, and that a sum, due from Hart to the orators, sufficient to pay that note might be offset thereto, and for general relief.

The defendant Hart answered, admitting substantially the facts alleged in the bill, except that he denied that he entered willingly into the agreements of Nov. 30, 1830, and Oct. 17, 1831, or that the note executed by Blake & McIntyre for the debt of Parker was made payable to him at his special request, or that he then agreed, that whatever Blake & McIntyre had against him, or against Blake & Hart, should be allowed upon that note, or that the advances made by McIntyre on account of the firm of Blake & Hart were made without the knowledge of Blake; and he alleged, that he had received from Langdon a full consideration for the note endorsed to him, and that he had delivered to Blake, and to Blake & McIntyre, collectable demands sufficient to pay whatever claims they might have against him. He also admitted, that he had become poor and unable to pay his debts.

The defendant Langdon answered, alleging that he purchased of Hart the note against Blake & McIntyre, in 1834, for a full consideration, being ignorant that Blake & McIntyre had any offset or defence to the note; that he immediately gave notice to Blake & McIntyre, that he had become the owner of the note; that the note was payable in one year from date; and that he had no knowledge as to any of the other matters alleged in the bill.

The answers were traversed, and testimony was taken, proving that notice was given by Langdon to Blake & McIntyre, in the summer of 1834, as alleged in his answer. It appeared, that the note endorsed to Langdon was made payable in one year from the first of April, 1834. The case was heard upon this testimony and the bill and answers.

The master, to whom the matter was referred, reported, that there was due upon the note endorsed to Langdon $270,49, and that the note of June 17, 1833, executed by Hart, in the name of Blake & Hart, to the orators, and the balance of the account, reported due to the orators by the auditor in the action upon the note, amounted in the whole to the sum of $331,03.

The court of chancery,—REDFIELD, Ch.,—decreed, that $270,49 of the last mentioned sum be set off in payment of the note endors-

Blake et al. *v.* Langdon et al.

ed to Langdon, and that Langdon be perpetually enjoined from prosecuting his action upon the note, and that Hart pay the balance of said sum of $331,03 to the orators in sixty days. From this decree the defendants appealed.

*L. B. Peck* for orators.

1. The *insolvency* of Hart is a sufficient ground for the court to exercise its equitable jurisdiction in allowing an equitable set off. *Lindsay* v. *Jackson*, 2 Paige 581. *Simpson* v. *Hart*, 14 Johns. 63. *Pond* v. *Smith et al.*, 4 Conn. 297. *Reed* v. *Bank of Newburgh*, 1 Paige 215.

2. The accounts, which the orators claim to offset, are in fact, though not in form, due from Hart alone. Blake, it is apparent, was not a partner with Hart, as between themselves; but he was such, as to third persons. In this point of view the case falls directly within the principle adopted by this court. *Ferris* v. *Burton*, 1 Vt. 439. *Puller et al.* v. *Roe et al.*, Peake's Cas. 197. *Stacy et al.* v. *Decy*, 2 Esp. R. 469. *Winch* v. *Keeley*, 1 T. R. 619.

3. The orators' right of set-off is not affected by the transfer of the note to Langdon, as he took it subject to all the equities that existed against it at the time of transfer. *Clute* v. *Robison*, 2 Johns. 593; 13 Johns. 9. *O'Callaghan* v. *Sawyer*, 5 Johns. 116. *Bank of Niagara* v. *McCracken*, 18 Johns. 343. *Ford* v. *Stuart*, 19 Johns. 342. *Hatch* v. *Greene*, 12 Mass. 195. *Jones* v. *Witter*, 13 Mass. 304. *Shapley* v. *Bellows*, 4 N. H. 347. *Sargent* v. *Southgate*, 5 Pick. 312. *Adams* v. *Bliss*, 16 Vt. 39.

*O. H. Smith* for defendants.

It appears, that there was no dissolution of the firm of Blake & Hart, until long after the account accrued between that firm and Blake & McIntyre. The firm of Blake & McIntyre have treated the dealings in question as a partnership business with Blake & Hart, according to the truth of the case. The writings dated Nov. 25, 1830, and Oct. 17, 1831, amount to a warranty, that Blake's share of the profit shall amount to $960,00 per year, and provide that Blake shall furnish about $3000 capital, without interest. These contracts were unconscionable and usurious, and ought not to be enforced. It is believed, that no case, or principle, can be found,

62

that will warrant a recovery in this case. Newl. on Cont. 365. 2 Sw. Dig. 60. 1 Story's Eq. §§ 188, 239, 244. *McDonald* v. *Nelson*, 2 Cow. 139. It is well settled, that joint debts cannot be set off against separate debts, nor separate debts against joint debts, either at law, or in equity. 2 Sumn. 409. 3 Mason 145. 5 Ib. 208, 213. The statute upon the subject of offsets merely applies to mutual debts. Sl. St. 144. It clearly appears, that McIntyre did not rely upon the note given by Blake & McIntyre to Hart as a mutual credit, on which he based his account, or the note for $68,75. The known rule in courts of equity is, that they follow the law in matters of set-off, unless there is some natural intervening equity, going beyond the statutes of set-off, which constitutes the general basis of set-off at law. Such a natural equity does arise, when there are mutual credits between the parties, or when there is an existing debt on one side, which constitutes the ground of a credit on the other side, or when there is an express or implied understanding, that the mutual debts shall be a satisfaction, or set-off, *pro tanto* between the parties. 2 Sumn. 412. 2 Story's Eq. Jur., §§ 1435-7. It was the latter of these rules, upon which the decision was predicated in *Ferris* v. *Burton*, 1 Vt. 439. Mere insolvency is no substantial ground of relief; and more especially that accruing long after an assignment of a demand to a *bona fide* holder. The private agreement between Blake and Hart, if it were not unconscionable, could not bind third persons, who were strangers to it. The note was negotiated, in the regular course of business, before it became due; and it is to be presumed, that the money paid by Langdon was used for the benefit of the firm;—but if Hart has committed a fraud, the loss, as between Blake and Langdon, must fall on Blake. Story on Part. 161.

The opinion of the court was delivered by

REDFIELD, J. This is a case where there has been considerable controversy, whether the court should regard the contract, or contracts, between Blake and Hart, under which they carried on their business, as so far binding, in equity, as to form the proper basis upon which to decree a set-off in the present case.

1. Without going at all into the nature of that contract,—which seems to have been understandingly made and voluntarily executed

Blake et al. v. Langdon et al.

upon both sides,—it will be sufficient, for the present purpose, to say, that the nature and binding force of that contract is not in issue in the present case. If Hart wished to be relieved from the effect of that contract, he should have filed his cross bill, stating the grounds upon which he claimed the relief, and thus had the accounts properly settled between the partners, if there should appear to be any just cause for the court of chancery to interfere in the matter. But to ask the court to thus take a leap in the dark, and declare the contract *unconcionable, unequal* and *oppressive* upon the mere inspection of the contract, is certainly not warranted by the precedents of procedings in equity. Had the case been illegal upon the face of it, *possibly* the subject might merit a different consideration. But it is to be considered, that it is not every *inequality* in a contract, which will justify a court of equity in setting it aside,—because that would require them to set aside almost all contracts, in these speculating times; and that, for any thing we can positively know, this contract *might* not have been unequal, (although we make no doubt it was,) for it is *possible*, that the profits might even have exceeded those which were insured by Hart. But at all events we now know no more upon that subject, than Hart knew at the time he entered into the contract; and should we proceed in a summary manner to set it aside, it must be upon the ground, that Hart should have had more circumspection, than to have entered into it; for there does not appear in proof any stress of circumstances, even, by which he was driven into the contract.

2. We do not see how Langdon can stand in any better position than Hart; for this being executed, and all the rights accrued, before the repeal of the proviso of the old statute in regard to promisory notes, all equitable defences, as well as those at law, are expressly reserved to the makers of the note.

3. The only remaining question is, whether the orators have made out a proper case for the interference of this court. Upon this point we need only refer to the case of *Downer* v. *Dana et al.,* 17 Vt. 518. That case is an authority, to the full extent, for the present. The debts here, as well as there, are substantially mutual, unless we regard the rights of McIntyre as defeating the mutuality,— which need not be taken into the account, as he, himself, asks for

the set-off. The note, then, was due to Hart and from Blake and McIntyre. The account was due from Hart,—that is, it was *ultimately his debt to pay ;*—so also, of the other notes. The case of *Ferris* v. *Burton,* 1 Vt. 439, is, also, a full authority for this decision.

The only difficulty, which this case has ever seemed to present, has arisen from the repeated declarations of judges and elementary writers, that, in regard to set-off, *courts of equity follow the same rules as courts of law,* and no more in the one case, than the other, can *joint and separate debts be set-off against each other.* To prevent future misapprehension and the necessity of going over this whole ground at every successive application of this kind, it may be proper to examine this subject somewhat more at length, than would otherwise seem necessary.

1. It is, I suppose, admitted on all hands, that courts of equity did exercise a jurisdiction upon this subject, before the statutes of set-off existed ; and consequently the jurisdiction is not based upon any statutes of set-off, and would exist as well without any such statutes as it now does, and would not be in any sense affected by the repeal of those statutes. *Ex parte Stephens,* 11 Ves. 24. *Ex parte Blagden,* 19 Ves. 465. *Hawkins* v. *Freeman,* 2 Eq. Cas. Abr. 10, *pl.* 10.

2. The writers upon English law seem to admit,—and that seems to be the sound reason, resulting from inference and presumption,— that the English statutes of set-off, the 2d of Geo. II and 5th of Geo. II, in relation to bankrupts, and some subsequent statutes, were passed mainly to obviate the necessity of a resort to chancery in every case of mutual independent claims upon both sides. 14 Petersd. Ab. (417) 301, and note. The general statute of set-off of 2 Geo. II is restricted to *mutual debts ;* while that in regard to bankrupts extends to *mutual credits.* In regard to the latter statute, the administration of which is almost altogether under the supervision of the court of chancery, they have exercised both an equitable and legal jurisdiction. That we will examine.

3. If the court of chancery in England continued to exercise any jurisdiction, in regard to this subject, after the passing of the statute, it is reasonable to suppose they would only interfere in those cases,

Blake et al. *v.* Langdon et al.

which did not properly come within the powers of the courts of law. How much they would go beyond the limits, which courts of law had prescribed for themselves, would, as in other cases, depend upon their own discretion ; and this discretion would, as in other cases, also depend a good deal upon the special circumstances of particular cases. Such, upon examination, we find to be the fact in regard to the set-off which the English chancery has allowed in bankrupt cases.

At law, it is well understood, the parties upon the record, only, will be regarded in allowing a set-off ; and the *nominal* parties must, consequently, be the *same*. But equity regards the real parties,— the parties ultimately to be affected by the decree. In the case of *Ex parte Quinten*, 3 Ves. 248, it seems to me the court go farther, than what a proper regard to the embarrassments attending similar inquiries in many cases would require or justify. But the case was evidently decided upon its particular equity. In that case a debt was actually divided, and a portion of it set off, according to the equitable rights of the parties. That is farther than courts of equity have often gone, I admit ; but I confess, that, under similar circumstances, I should be inclined to adopt the reasoning of Lord Loughborough in this case. He goes upon the ground, that " The *right* is manifest, the *equity* is a *clear* and a *strong* one." Courts of equity interfere, in cases of set-off, upon analogous grounds to those upon which their whole *preventive* jurisdiction is based,—that is, to *prevent irremediable injustice.* It is upon this ground, that one will be restrained by injunction from doing mischief to mines, shade trees, monuments, and in many such like cases, where compensation in damages is no *adequate remedy.* So, too, when one is pursuing an action at law, against which he has himself given a bond of indemnity, he will, to prevent circuity of action, be restrained by injunction.

It is upon these grounds, that I think, when the debts are *in reality mutual*, or to that extent, even, when the debt must be apportioned, and the party, attempting to enforce his claims at law in the name of some other party *but nominally interested*, is himself *insolvent* a, court of equity should and will interfere to prevent the injustice by decreeing the set-off. Such, as I understand, is the uniform

course under the English bankrupt laws;—which are not broader than the statutes of set-off in this state.

The case of *James* v. *Kynnier*, 5 Ves. 108, is a full authority to the very point for which I contend. There was no pretence here, that there was any mutuality in the debts *at law*. Upon the most favorable view, it was setting off a separate debt against a joint debt, Lord Loughborough says, "I have not a particle of doubt upon this case, which is the clearest I ever heard." The only equity, upon which the case rested, was, that the debts were in *reality* mutual *and an intervening insolvency*. *Ex parte Stephens*, 11 Ves. 24, is clearly a case of *equitable* set-off, "*where there could be none at law*," as is said in the marginal note to the case. The note appended to the case of *James* v. *Kynnier* in Summer's edition of Vesey, states the rule upon this subject very fairly;—" The doctrine of set-off, under the statute, must be the same at law as in equity; but the equitable jurisdiction on this subject prevailed long before the statute of Geo. II. And this difference seems established, namely, that a set-off, at law, must be founded on a strict case of mutual debt, or mutual credit; *but that a more extended construction may be made in equity.*" *Ex parte Blanden*, 19 Ves. 467. *Ex parte Flint*, 1 Swanst. 34. *Taylor* v. *Okey*, 13 Ves. 181. The case of *Hanson ex parte*, 12 Ves. 345–6, is the very case of setting off a separate debt against a joint debt, and upon equitable grounds merely.

The general rule undoubtedly is, in equity as well as at law, that joint and separate debts cannot be set-off against each other. Such is the language of all the cases and of all the writers upon the subject. But they almost all allow of a sweeping exception, and nearly in the same words,—" *under particular circumstances ;* " Ld. ELDON, in 3 Meriv. 618, quoted with approbation by Chancellor KENT in *Dale* v. *Cooke*, 4 Johns. Ch. R. 13 ; Story on Part., § 395 ; 2 Story's Eq. Jur., § 1432 *et seq.* The difficulty of *defining* these circumstances is hinted at by Justice Story, § 1437, thus,—" These are so various as to admit of no comprehensive enumeration." These inquiries might be pursued very much farther. But when it is remembered, that, in almost all the cases where courts of equity have interfered to go beyond the statutes of set-off, it has been where there had intervened the insolvency of one or more of the parties, and that these

Blake et al. *v.* Langdon et al.

are almost the only cases where the interference is of any importance, and that the cases thus far furnish no other ground for interfering, it is made sufficiently obvious, that these peculiar circumstances do not ordinarily occur, except in cases of insolvency. But beyond this, courts of equity have not generally gone.

But in looking into the subject of set-off, or *compensation*, as it existed in the civil law, where, upon suit being brought, all matters in dispute between the parties were to be adjusted, as much as in the case of a general submission to arbitrators,—I mean all matters of contract, whether liquidated or not—When we consider this, and how beneficial such a course ordinarily proves to the parties, at least, one cannot but wonder at the great circumspection and reserve made use of in courts of equity upon this subject. The remarks of Mr. Justice Story, in 2 Eq. Jur. 668, §1444, are just and forcible;—"The general equity and reasonableness of the principles, upon which the Roman superstructure is founded, make it matter of regret, that they have not been transferred, to their full extent, into our system of equity jurisprudence."

Enough has been said, I trust, to show that the present case comes clearly within the principles of equity, upon which this branch of equity law rests, and also far within the range of the decided cases, and to satisfy all, that courts of equity need not feel over-solicitous to restrict this portion of their remedial jurisdiction, which is so just and salutary in its operation, and so impossible of being abused, and which so universally obtains in all countries, whose jurisprudence is founded upon the Roman civil law.

Decree of the chancellor affirmed.